KASOWITZ BENSON TORRES LLP
Robert W. Bosslet (SBN 278027)
2029 Century Park East, Suite 2000
Los Angeles, CA  90067
Telephone: (424) 288-7900
Fax: (424) 288-7901
rbosslet@kasowitz.com

*Attorneys for Defendant*
*MusclePharm Corporation*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MusclePharm Corporation, a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>NBF Holdings Canada Inc., a Canadian corporation,<br><br>Defendant. | Case No.<br><br>**PLAINTIFF MUSCLEPHARM CORPORATION'S COMPLAINT FOR DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff MusclePharm Corporation ("MusclePharm" or "Plaintiff"), by and through its undersigned counsel, brings this Complaint against NBF Holdings Canada Inc. ("Nutrablend" or "Defendant") and respectfully alleges as follows:

## INTRODUCTION

1. This action for declaratory relief and damages arises out of Nutrablend's complete and total neglect of its responsibilities under a Confidential Settlement Agreement (the "Agreement") that the parties entered into on September 17, 2020, in order to resolve an action that the parties were litigating in this Court. Among other things, the Agreement requires MusclePharm to submit certain minimum quantities of purchase orders to Nutrablend for blended health nutrition products, and requires Nutrablend to fulfill those purchase orders.

2. Pursuant to the Agreement, MusclePharm submitted over $2 million in purchase orders, to be fulfilled in September 2020. After months of delay, Nutrablend was only able to supply approximately one-third of the product that MusclePharm had ordered, and even that product was supplied two months later than agreed. Nutrablend's failures caused significant damages to MusclePharm, including in the form of increased costs, lost sales, customer chargebacks, and reputational harm among MusclePharm's key customers. Nutrablend's egregious supply failures also have caused MusclePharm to harbor substantial concern and insecurity about Nutrablend's ability to source and supply product going forward.

3. MusclePharm has also developed significant concerns about Nutrablend's pricing for its products. The parties agreed in the Agreement that Nutrablend would utilize a "cost-plus" pricing formula for all products supplied, with Nutrablend passing through to MusclePharm its raw ingredient costs plus an agreed-upon margin. Prior to the Agreement, Nutrablend shared sample price quotes that indicated Nutrablend would charge a reasonable price consistent with that of

MusclePharm's other suppliers. However, immediately after entering into the Agreement, Nutrablend's prices increased dramatically, calling into question whether Nutrablend was truly passing through its costs (as agreed), and/or whether Nutrablend was abusing the Agreement's cost-plus arrangement to improperly shift its highest-cost ingredients to MusclePharm, in order to maximize Nutrablend's profitability while maximizing MusclePharm's costs.

4. The Agreement calls for MusclePharm to issue at least $500,000 of purchase orders every month to Nutrablend – an amount that in many months would equal 25% or more of MusclePharm's entire supply. After Nutrablend's abject failure to process MusclePharm's initial purchase orders, MusclePharm obviously could not entrust Nutrablend with such a significant portion of its business without assurances that Nutrablend's prior supply failures would not be repeated, and that Nutrablend would not charge prices substantially higher than MusclePharm's other suppliers. Accordingly, MusclePharm repeatedly reached out to Nutrablend, both orally and in writing, raising MusclePharm's concerns, and expressly seeking reasonable and specific assurances from Nutrablend about its ability and intention to perform its obligations under the Agreement.

5. To date, Nutrablend has refused to provide *any* assurances whatsoever to MusclePharm. Instead, Nutrablend has attempted to downplay MusclePharm's concerns, accused *MusclePharm* of breaching the Agreement, and simply ignored MusclePharm's repeated, reasonable requests for assurances.

6. Under California law, including Section 2-609 of the UCC, Nutrablend's refusal to provide reasonable assurances to MusclePharm, Nutrablend's material breach of the Agreement, and Nutrablend's frustration of the purpose of the Agreement, permits MusclePharm to suspend performance and terminate that portion of the Agreement that would otherwise require MusclePharm to issue purchase orders to Nutrablend. MusclePharm has suspended its

performance, and seeks a determination and declaration that its obligations to issue purchase orders under the Agreement has been rightfully terminated. MusclePharm also seeks damages caused by Nutrablend's failure to timely supply product, which breached the Agreement.

## PARTIES

7. Plaintiff MusclePharm is a corporation organized and existing under the laws of Nevada, with a principal place of business at 4500 Park Granada, Suite 202, Calabasas, California 91302.

8. Defendant Nutrablend is a corporation organized and existing under the laws of Ontario, Canada, with a principal place of business at 32 Cherry Blossom Road, Cambridge, Ontario N3H 4R7.

## JURISDICTION AND VENUE

9. This Court has diversity jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Nutrablend because, among other things, this case arises from Nutrablend's transaction of business within the State of California, and, pursuant to Paragraph 16 of the Agreement, Nutrablend expressly submits to the jurisdiction of the state and/or federal courts located within Los Angeles in the State of California for resolution of any dispute arising out of the Agreement.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims asserted herein are based occurred in this District, and because Nutrablend submitted to venue in the state and/or federal courts located within Los Angeles in the State of California, and waived any objections to such venue.

# FACTUAL BACKGROUND

### A.     The Parties and the First Action

12.    Plaintiff MusclePharm is a sports nutrition company which markets and sells various exercise supplements, such as protein powders and bars, creatine, pre-workout, and amino-acids in 120 countries around the world.

13.    Defendant Nutrablend is a manufacturer of blended health nutrition products for sale by nutritional supplement companies (such as MusclePharm) under those companies' respective brands.

14.    At times during the past several years, Nutrablend has provided certain contract manufacturing services for MusclePharm.

15.    On February 28, 2020, Nutrablend commenced an action in this Court, captioned *NBF Holdings Canada Inc., v. MusclePharm Corporation*, Case No. 2:20-cv-01946 (the "First Action"). Generally, Nutrablend alleged that MusclePharm failed to pay for approximately $3,085,641.52 in product that Nutrablend claimed was ordered by, and shipped to, MusclePharm.

### B.     The Agreement

16.    On September 17, 2020, MusclePharm and Nutrablend entered into the Agreement, resolving and settling all causes of action in the First Action.

17.    In exchange, MusclePharm agreed to pay Nutrablend $3,085,641.52 through monthly payments spread over 13 months (the "Monthly Payments"). ***To date, MusclePharm has made each and every Monthly Payment when due (and/or within the applicable grace period for such payment). Moreover, MusclePharm does not dispute its obligation to continue making the Monthly Payments, and is not seeking termination of that obligation through this action.***

18. In the Agreement, MusclePharm also agreed to issue purchase orders to Nutrablend, for certain minimum amounts at certain specified intervals (the "Purchase Orders").

19. Specifically, MusclePharm agreed to issue the Purchase Orders based on certain pay periods specified in the Agreement (the "Pay Periods"): September 1, 2020 through November 30, 2020 ("First Pay Period"); December 1, 2020 through February 28, 2021 ("Second Pay Period"); March 1, 2021 through May 31, 2021 ("Third Pay Period"); June 1, 2021 through August 31, 2021 ("Fourth Pay Period"); September 1, 2021 through October 30, 2021 ("Fifth Pay Period"). Beginning November 1, 2021, MusclePharm also agreed to issue a minimum of $700,000 in Purchase Orders to Nutrablend each month until the $3 million balance was paid in full.

20. Throughout summer 2020, prior to executing the Agreement in September 2020, the parties engaged in extensive settlement discussions. During these settlement discussions, the parties also discussed purchase orders that MusclePharm would place in order to resume its business relationship with Nutrablend (which had stalled at around the time the litigation was commenced). Both parties expressly understood and contemplated that the Purchase Orders submitted by MusclePharm during the summer – even if submitted prior to the execution of the Agreement – would be included within the Agreement's scope, and counted towards the Agreement's minimums.

21. That these Purchase Orders would be included in the Agreement's scope was a crucial point for MusclePharm: MusclePharm never would have placed Purchase Orders with Nutrablend while they were in an ongoing litigation, without the understanding that these Purchase Orders would be part of the Agreement that was being negotiated at the time. Thus, on several dates in July, August, and September 2020, MusclePharm submitted a total of $2,022,886.68 in Purchase

Orders to Nutrablend, in express reliance on the fact that these Purchase Orders would count towards MusclePharm's minimum requirements under the Agreement. Nutrablend expressly understood this fact – indeed, in a text message on September 9, 2020, a few days before the Agreement was signed, Nutrablend's CEO urged MusclePharm's CEO to ensure that the parties "please conclude this agreement so we do not have production delays," since "*[t]he PO's are on hold pending the finalization [of the Agreement]*."

22. The Agreement spells out the consequences of a failure by MusclePharm to make timely payment of the Monthly Payments or to issue any of the purchase orders. Among other things, if not cured within the applicable grace period, any failure by MusclePharm to make a Monthly Payment, or to issue any of the agreed Purchase Orders, will constitute an Event of Default, upon which Nutrablend may accelerate and submit, file, and enter a stipulated judgment against MusclePharm for whatever remains of the original $3 million balance under the Agreement (the "Stipulated Judgment").

23. Given the significant consequences of a Default under the Agreement, MusclePharm requested and obtained an extensive cure period for its Purchase Order-related obligations. Specifically, under Paragraphs 2(g) and (h) of the Agreement, MusclePharm has twelve months from the end of each Pay Period to cure any failures to meet purchase order minimums during that period.

24. The pricing for the Purchase Orders was a cost-plus arrangement, based on the "mutually agreeable market cost of materials and packaging," plus a set percentage for manufacturing overhead and a "conversion fee." The Agreement states that this pricing is subject to annual review.

25. On October 2, 2020, pursuant to the Agreement, the parties jointly filed a stipulation to dismiss the original litigation with prejudice, which the Court entered on October 28, 2020.

  **C.** **Nutrablend Fails to Perform its Obligations Under the Agreement**

26. As noted above, on various dates in July and August 2020, MusclePharm submitted Purchase Orders to Nutrablend (with the understanding that they would count towards MusclePharm's minimum purchase obligations under the Agreement). Nutrablend accepted MusclePharm's Purchase Orders and promised to provide the product to MusclePharm by September of 2020. Nevertheless, Nutrablend did not deliver *any* product to MusclePharm until late December of 2020. And when it did so, it only supplied only a small portion of MusclePharm's orders.

27. In light of Nutrablend's ongoing failure to fulfill the Purchase Orders, MusclePharm was forced to take drastic measures to ensure that it had enough product for its customers.

28. Specifically, to fulfill the remaining orders that Nutrablend had committed – and failed – to supply, MusclePharm was forced to reprioritize its limited inventory, as well as its other contract manufacturers' production schedules. This caused delays in production for other customers.

29. Given the precarious position in which Nutrablend's failures placed MusclePharm, MusclePharm's efforts to cover Nutrablend's shortages were only partially successful. When it was unable to provide full timely delivery, MusclePharm was subject to returns and chargebacks from Amazon, which it was forced to pay solely as a result of Nutrablend's inability to supply.

30. In sum, Nutrablend's failures in fulfilling MusclePharm's purchase orders have had severe consequences for MusclePharm's business and have caused the company significant damages in the form of, among other things, increased costs, lost sales, and damage to MusclePharm's reputation among its key customers.

  **D.** **Nutrablend's Substantial Pricing Increases**

31. Nutrablend's pricing also has been inconsistent with the terms of the Agreement. MusclePharm entered into the Agreement with Nutrablend with the

expectation that prices would reflect those contained on a price list it received from Nutrablend on August 30, 2020. The prices on this list were substantially lower than those Nutrablend then subsequently quoted to MusclePharm just weeks later.

32. Indeed, since the parties executed the Agreement, Nutrablend has consistently given MusclePharm price quotes that are significantly higher than Nutrablend's competitors.

### E. Nutrablend has Failed to Meaningfully Respond to MusclePharm's Repeated Requests for Assurances

33. Given Nutrablend's supply failures and substantial price increases, MusclePharm developed substantial concerns about Nutrablend's ability to perform its obligations to timely fulfill MusclePharm's Purchase Orders.

34. MusclePharm had good reason for concern; delays in supply from a contract manufacturer cause major issues for MusclePharm. When MusclePharm does not receive the correct amount of product from a contract manufacturer, or it receives that product late (or, as here, both), MusclePharm is forced to reprioritize its limited inventory, as well as its other contract manufacturers' production schedules. The end result is delayed product shipment to MusclePharm's customers, increased costs, lost sales, and reputational harm to MusclePharm.

35. The risk from a supply failure by Nutrablend was particularly acute due to the size of the Purchase Order commitment under the Agreement. As noted above, the Agreement required MusclePharm to place between $500,000 and $700,000 in Purchase Orders with Nutrablend every month. In some months, these Purchase Orders would constitute 25% or more of MusclePharm's total supply of product. Accordingly, the Purchase Orders that Nutrablend was demanding that MusclePharm place represent a substantial portion of MusclePharm's business. Moreover, given the size of the Purchase Orders, MusclePharm cannot afford to simply "hedge" the risks of Nutrablend failing to supply by submitting identical

Purchase Orders to both Nutrablend and another manufacturer – MusclePharm simply cannot afford to purchase the same product twice, just in case Nutrablend once again fails to perform. In other words, if it were to proceed to place the Purchase Orders called for by the Agreement, MusclePharm would necessarily be incurring substantial risk to its business.

36. Given that risk, MusclePharm understandably sought assurances from Nutrablend regarding Nutrablend's production capabilities, availability, and supply chain so that the egregious and costly supply failures from late 2020 would not be repeated in 2021.

37. Initially, these requests were largely oral. Ultimately, MusclePharm made a series of written requests to Nutrablend for reasonable assurances that Nutrablend could and would fulfill any additional Purchase Orders that MusclePharm placed.

38. First, on March 31, 2021, MusclePharm's CEO emailed Nutrablend's CEO. MusclePharm reiterated the substantial damages it suffered due to Nutrablend's supply failures, as well as its significant concerns about Nutrablend's ability to perform going forward. Among other things, MusclePharm stated:

> We need adequate and concrete assurances from NutraBlend that it has the ability and intention to fulfill MusclePharm's POs going forward. Absent such assurances – which should include, among other things, evidence of NutraBlend's uncommitted and committed production capacity, immediate progress toward fulfilling specific orders, and on site visits from our management – MusclePharm cannot continue to entrust its business with NutraBlend.

39. MusclePharm also pointed out the discrepancy in Nutrablend's historical and current pricing, and requested that Nutrablend "provide detailed records that substantiate the substantial increase in costs that NutraBlend appears to claim occurred immediately after the agreement was signed in September."

40. Second, on April 16, 2021, when Nutrablend did not respond to MusclePharm's March 31, 2021 email, MusclePharm's CEO sent yet another email. In that email, MusclePharm noted that it had not received any response to its March 31 correspondence, and explained that Nutrablend's failure to respond only heightened MusclePharm's significant concerns about Nutrablend's ability to fulfill its obligations under the Agreement. As with its prior correspondence, MusclePharm sought to set up a call with Nutrablend to speak about the future of the parties' relationship, and to confirm that Nutrablend would provide the assurances and information that MusclePharm had requested. MusclePharm also asked Nutrablend to provide it with Nutrablend's protein purchase orders (an essential ingredient in the products that Nutrablend was to manufacture for MusclePharm) and invoices for the past six months, so that MusclePharm could verify that the prices Nutrablend quoted were consistent with the parties' Agreement.

41. Nutrablend finally responded to MusclePharm on April 19, 2021. Although Nutrablend advanced several arguments as to why its pricing had changed, and then demanded that *MusclePharm* provide a "detailed plan" on how it would fulfill its obligations under the Agreement, Nutrablend simply ignored MusclePharm's significant concerns about Nutrablend's ability to fulfill Purchase Orders, as well as MusclePharm's requests for assurances.

42. Third, on April 29, 2021, MusclePharm's CEO sent another email to Nutrablend, responding to Nutrablend's April 19 email and again noting that Nutrablend's conduct had seriously damaged MusclePharm's business. MusclePharm once again demanded that Nutrablend provide assurances of its supply chain and ability to satisfy purchase orders going forward, and stated that it "cannot supply any more POs until you can provide a timeline outlining when each component will be available." Nutrablend did not respond to this email.

43. Fourth, on May 26, 2021, MusclePharm – now through counsel – sent a letter to Nutrablend's counsel, outlining MusclePharm's significant concerns about Nutrablend's ability to supply (*i.e.*, the same concerns MusclePharm had been stressing to Nutrablend for months). In the letter, MusclePharm noted that it had repeatedly sought assurances from Nutrablend about its ability and intention to fulfill MusclePharm's purchase orders, and repeatedly requested detailed records substantiating Nutrablend's significant price increases. MusclePharm concluded the letter by asking Nutrablend to confirm by no later than June 2, 2021 that Nutrablend would promptly provide the assurances that MusclePharm had repeatedly sought.

44. Nutrablend responded to the May 26 letter on June 2, 2021. While the letter accused *MusclePharm* of breaching the Agreement, and also stated that the $2 million in purchase orders that MusclePharm submitted in 2020 did not count towards MusclePharm's minimums under the Agreement, Nutrablend once again simply ignored MusclePharm's requests for assurances. If anything, Nutrablend's June 2 letter only increased MusclePharm's already significant insecurity and grave doubts about Nutrablend's ability and intention to perform, by acknowledging that Nutrablend has been unable to obtain the raw materials that it would need to fulfill the purchase orders that it was demanding that MusclePharm still place. Specifically, Nutrablend stated in its letter that "whey protein and mass gainers" – critical ingredients for MusclePharm's products – "[are] currently being sold ***beyond manufacturing capacity***," and that "[m]ost whey manufacturers will not quote product for the next quarter, as prices are moving by the day, ***assuming a buyer can even find a supplier***."

45. Fifth, on June 14, 2021, MusclePharm responded to Nutrablend's June 2 letter, pointing out that Nutrablend had once again failed to provide reasonable assurances concerning Nutrablend's ability to perform under the

Agreement, and noting that Nutrablend's failure permitted MusclePharm to terminate that portion of the Agreement that deals with the Purchase Orders.

46. To date, notwithstanding five separate written requests from MusclePharm, Nutrablend has failed to provide MusclePharm with any assurances whatsoever about its ability to supply product.

## COUNT I
**(Declaratory Relief)**

47. MusclePharm hereby realleges and incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

48. An actual controversy has arisen and now exists between MusclePharm and Nutrablend regarding the parties' rights under the Agreement.

49. MusclePharm placed approximately $2 million in Purchase Orders with Nutrablend, pursuant to the parties' Agreement. Nutrablend failed to provide MusclePharm with the majority of the products MusclePharm ordered, and even the little product they were able to supply was approximately two months late.

50. Throughout the spring of 2021, MusclePharm demanded in writing that Nutrablend provide assurances that it has the ability and intention to fulfill MusclePharm's purchase orders going forward, including in the form of evidence of Nutrablend's production capacity, supply chain, and raw material procurement timeliness, as well as allow MusclePharm management to make on-site visits to its facilities.

51. Nutrablend repeatedly failed to provide any such assurances, and to date has simply ignored MusclePharm's requests.

52. Under Section 2-609(4) of the UCC, "[a]fter receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." Accordingly, under the UCC,

Nutrablend has repudiated the Agreement's Purchase Order provisions through its failure to provide reasonable assurances of due performance after numerous written demands by MusclePharm.

53. Moreover, Nutrablend's failure to deliver the product to MusclePharm in response to its Purchase Orders constitutes a material breach of the Agreement. Under the Agreement, Nutrablend had but one primary obligation in response to MusclePharm's submission of purchase orders: to deliver the product MusclePharm requested at the specified time. Nutrablend breached this obligation.

54. Nutrablend's conduct also frustrated the purpose of the Agreement, which was to provide MusclePharm with a steady supply of product (and Nutrablend with a steady source of revenue).

55. Nutrablend disputes MusclePharm's position and has asserted that MusclePharm remains obligated to issue Purchase Orders in accordance with the schedule set forth in the Agreement.

56. An actual controversy therefore exists as to whether MusclePharm remains obligated to issue Purchase Orders to Nutrablend for blended health nutrition products as set forth under the Agreement.

57. An actual controversy also exists concerning whether the approximately $2 million in Purchase Orders that MusclePharm issued to Nutrablend in 2020 count towards the minimum required purchase order amounts outlined in the Agreement. Although it was the parties' express intention and agreement that they would be included, Nutrablend has taken the position that they must be excluded.

58. Accordingly, a determination and declaration of the parties' rights are necessary and appropriate at this time in order to avoid the potential for future additional lawsuits.

## COUNT II
### (Breach of Contract)

59. MusclePharm hereby realleges and incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

60. The Agreement constitutes a valid and enforceable contract existing between MusclePharm and Nutrablend.

61. MusclePharm has performed under the Agreement by submitting Purchase Orders to Nutrablend, but any further performance is now excused by, among other things, Nutrablend's material breach of the Agreement and Nutrablend's failure to provide MusclePharm with adequate assurances under UCC 2-609.

62. Nutrablend has breached, and continues to breach, the Agreement by failing to provide MusclePharm with products that it agreed to provide to MusclePharm in response to valid Purchase Orders.

63. Alternatively, Nutrablend breached, and continues to breach, the Purchase Orders that MusclePharm has validly submitted, and Nutrablend accepted. Nutrablend breached the Purchase Orders by failing to provide MusclePharm with approximately two-thirds of the products it has ordered, and failing to supply the remaining products on a timely basis. MusclePharm was damaged by Nutrablend's failure in the form of increased costs, lost sales, and reputational harm.

64. As a legal and proximate result of Nutrablend's breaches, MusclePharm has incurred and continues to incur damages, including increased costs, lost sales, customer chargebacks, and damage to its reputation among its key customers.

## COUNT III
### (In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing)

65. MusclePharm hereby realleges and incorporates by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

66. The Agreement constitutes a valid and enforceable contract existing between MusclePharm and Nutrablend.

67. MusclePharm performed its obligations under the Agreement by submitting purchase orders to Nutrablend for blended health nutrition products.

68. In submitting purchase orders to Nutrablend for blended health nutrition products, MusclePharm satisfied all conditions required for Nutrablend to perform under the Agreement by supplying MusclePharm with these products.

69. Nutrablend prevented MusclePharm from receiving the benefits under the Agreement by failing to satisfy the vast majority of the $2,022,886.68 in purchase orders that MusclePharm placed under the Agreement, and those orders that Nutrablend did fulfill were completed more than two months later than the date Nutrablend promised MusclePharm.

70. In providing MusclePharm with a significantly smaller amount of products than MusclePharm ordered, more than two months later than agreed upon, Nutrablend did not act fairly and in good faith.

71. As a legal and proximate result of Nutrablend's conduct, MusclePharm suffered damages in the form of, among other things, increased costs, lost sales, and damage to its reputation among its customer base.

## JURY DEMAND

72. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MusclePharm demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, MusclePharm respectfully requests that the Court enter judgment against Nutrablend as follows:

A. A judgment declaring that that portion of the Agreement requiring MusclePharm to issue Purchase Orders to Nutrablend has been validly terminated

and is no longer in effect, and MusclePharm is no longer required to issue Purchase Orders under the Agreement;

  B. A judgment declaring that the approximately $2 million in Purchase Orders that MusclePharm placed in July and August 2020 are within the Agreement;

  C. Damages in an amount to be determined at trial;

  D. Pre-judgment interest to the extent permitted by law;

  E. The costs of this action;

  F. Attorneys' fees; and

  G. Such other further relief as the Court may deem just and proper.

DATED: July 7, 2021    **KASOWITZ BENSON TORRES LLP**

            /s/ *Robert W. Bosslet*
            Robert W. Bosslet
            2029 Century Park East
            Suite 2000
            Los Angeles, California, 90067
            Tel.: (424) 288-7900
            Fax: (310) 943-3871
            Email: rbosslet@kasowitz.com

            *Attorneys for Plaintiff*
            *MusclePharm Corporation*